## ESTATE STOVE CO. v. GENERAL MOTORS CORPORATION et al.

### Civil Action No. 103.

United States District Court
S. D. Ohio
Western Division.
April 12, 1948.

Greer Marechal, Lawrence B. Biebel, and Marechal & Biebel, all of Dayton, Ohio, and Daniel L. Morris and Blair, Curtis & Hayward, all of New York City, for plaintiff.

Drury W. Cooper, Thomas J. Byrne and Cooper, Kerr & Dunham, all of New York City, and George H. Strickland and Robert R. Candor, both of Dayton, Ohio, for defendants.

NEVIN, District Judge.

This suit was instituted under the patent laws of the United States. The action originally was commenced by the plaintiff, The Estate Stove Company, an Ohio corporation, having its principal place of business in Hamilton, Ohio, against the defendants, General Motors Corporation and General Motors Sales Corporation, both corporations of the State of Delaware, and both having a place of business in Dayton, Ohio.

Originally, in its complaint filed March 14, 1941, plaintiff included Kahn patent No. 2,176,075 among the others which it charged defendants with infringing. At the trial, counsel for plaintiff informed the court (Rec. pp. 18, 19) that this patent (Kahn patent No. 2,176,075) had been withdrawn and was not to be further considered. Originally, too, a counterclaim had been filed by defendants but that, also, counsel stated, had been withdrawn.

At the trial, therefore, there were six patents actually before the Court and now involved in this litigation. Those patents, together with the claims charged to be infringed of each one respectively, are as follows:

Noma Electric Corporation was joined as a party plaintiff herein and thereupon it submitted itself to the jurisdiction of this Court.

Also subsequent to the institution of this suit, to-wit, on December 31, 1941, the defendant, General Motors Sales Corporation, was liquidated. At the trial (Rec. p. 14) it was stipulated, however, by defendant, General Motors Corporation, that "the sales organization was a wholly owned subsidiary of General Motors, which at all times is responsible for anything the sales organization did. When it was wiped out, it was just as though the suit was against General Motors solely and it was responsible for anything that is done."

Alleged Unfair Competition.

In addition to infringement the complaint, in paragraphs 8, 9, 10, 11, 12 and 13 thereof, charges defendants with unfair business practices in connection with the sale of the alleged infringing electric ranges. As to this the record (p. 19 et seq.) shows the following: "Mr. Marechal (of counsel for plaintiff): There was also in the complaint as a second matter of litigation a claim of unfair competition or unfair business practices based upon, very generally speaking, the allegation that General Motors or General Motors Sales Corporation, or both, had improperly utilized a trade-mark of the plaintiff in its advertising and conduct of its business in

| Named Inventor | | Number | Date | Claims in Issue [1] |
|---|---|---|---|---|
| (Ex.1) | Bradbury | 2,055,246 | Sept. 22, 1936 | 1, 11, 14, 24 |
| (Ex.2) | Kahn and Hake · | 2,079,618 | May 11, 1937 | 2, 3, 4, 5, 6 |
| (Ex.3) | Kahn and Hake | 2,123,699 | July 12, 1938 | 4, 5, 6, 9 |
| (Ex.4) | Kahn | 1,786,429 | Dec. 30, 1930 | 4, 5, 6, 8, 15, 18 |
| (Ex.5) | Kahn | 1,717,221 | June 11, 1929 | 13, 14 |
| (Ex.6) | Wells | 1,785,568 | Dec. 16, 1930 | 1, 2, 3 |

Subsequent to the institution of this action, to-wit, on July 31, 1946, the plaintiff, Noma Electric Corporation, a corporation of Maryland, became, and it now is, vested with title to all the foregoing letters patent. By agreement of the parties,

the selling of the electric ranges which were the subject matter involved in the claimed infringement. The trade-mark in question is one which has been used by the Estate Stove Company for many years and has been applied to its so-called Bradbury

---

[1] Bradbury patent No. 2,055,246 has 24 claims altogether; Kahn and Hake patent No. 2,079,618 has 6 claims; Kahn and Hake patent No. 2,123,699 has 9 claims; Kahn patent No. 1,786,429 has 18 claims; Kahn patent No. 1,717,221 has 15 claims; Wells patent No. 1,785,568 has 3 claims.

ranges, that is, ranges which it has manufactured and sold under the Bradbury patent No. 2,055,246, as "balanced oven heat."

At the conclusion of plaintiffs' prima facie case (Rec. pp. 699 and 811) defendants moved to dismiss "as to the two charges of unfair competition, on the ground that no evidence whatever has been introduced here on either."

This motion the court sustained, the pertinent parts of the record showing as follows: "The Court (pp. 828 et seq.): The cause is now before the Court on the motion filed on behalf of the defendants to dismiss from the case or take out of the case for any further consideration whatever charge or charges there are in paragraphs 8, 9, 10, 11, 12 and 13 which have reference to or bear upon the issue of unfair competition. * * * It has been stated by counsel for plaintiff that trademark infringement technically, as such, is not here charged. We are not dealing with a registered trade-mark, but that there is a trade-mark and trade-name, or a use of some words or language (by plaintiff) over a period of many years. * * * The Court is asked to enjoin the use of these words, this trade-mark or trade-name, 'Balanced Heat.' * * * The Court is of the opinion under the facts in this case and the evidence adduced, the charges of unfair competition that are based upon the use of the trade-mark or trade-name, be it 'Balanced Heat' or whatever it was, at least, what is charged in the complaint is not sustained, * * * and the motion will be sustained with regard to any question of unfair competition. * * * There is not sufficient proper evidence in this record to warrant the Court to issue an injunction. That will be denied and the motion (of defendants) will be (and it is) sustained." Further reference to this aspect of the case is made by the Court in its Findings of Fact and Conclusions of Law.

## Validity.

At the conclusion of the trial defendants moved (Rec. p. 1233) to dismiss the complaint "on the ground that the evidence establishes without any contradiction whatever the invalidity of all six patents." As to this the record (pp. 1234 et seq.) further shows as follows:

"Mr. Cooper: (of counsel for defendants) I shall rest my motion to dismiss upon the plain invalidity of each of the patents. * * *

Mr. Morris (of counsel for plaintiff): Your Honor, I should not object at all to replying to Mr. Cooper on the question of validity, if your Honor cares to take the matter up in that way, first dispose of validity and then of infringement.

"Mr. Cooper: I am not dealing with infringement at all now.

"The Court: I understand that. * * * I have no objection to taking up the question of validity first and deciding that question before we get into the question of infringement."

The cause is now before the Court on defendants' motion to dismiss above referred to, with (Rec. p. 1264) "the understanding that the future conduct of the case will depend on the results of the conclusion of the Court on this point."

█ Regardless of the question of infringement it is proper always for the District Court to inquire fully into the validity of the patent or patents in suit. In fact, it usually is the better practice to do so. Sinclair & Carroll Co. v. Interchemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644. At what stage of the trial this inquiry shall be made rests in the sound discretion of the trial court to be exercised in the light of the facts and circumstances surrounding the particular case.

We come then to a consideration of the validity of the claims in issue of the patents in suit.

█ The patents and the claims thereof in issue here "are presumedly valid." Oil Conservation Engineering Co. v. Brooks Engineering Co. 6 Cir., 52 F.2d 783, 785; Merco Nordstrom Valve Co. v. W.M. Acker Organization et al., 6 Cir., 131 F.2d 277, 280; Radio Corporation et al. v. Radio Engineering Laboratories, Inc., 293, U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163. While the effect of the force and persuasiveness of such presumption is sometimes questioned.

nevertheless, "Once the patent has been issued by the patent office there is the presumption that it is valid." Swank Products, Inc., v. Silverman et al., D.C., 21 F.Supp. 927, 928.

The devices of the manufacture and sale of defendants which are charged to infringe upon the claims in issue of the patents sued upon in the complaint are electric ranges identified by the designations Model B–60–40 and Model B–60–41 by defendant, General Motors Corporation. They are exemplified by Exhibit 8 (Photographs Exhibits 9a to 9g inc.) and Exhibit 10 (photographs Exhibits 60a to 60h inc.) respectively.

Reference is hereinafter made, by the Court, to each of the patents in suit and to the prior art and uses asserted against them, respectively, in its Findings of Fact.

However, even though it may be repetitious to some extent, it will be helpful to an understanding of the case to here review briefly the claims in issue; to refer to some of the pertinent evidence relating to them; to the arguments presented by defendants as to why they are, as defendants submit, invalid, and to the contentions of plaintiff upon which it bases its assertions that their validity should be sustained.

*Bradbury Patent No. 2,055,246* (Exhibit 1) is for an "Electric Range." The patent recites that the "invention relates to the arrangement and control of heating elements for electric ranges."

The claims in issue are 1, 11, 14 and 24. They define the invention as pointed out in, the Bradbury specification. Of these, Claims 1, 11 and 24[2] have been designated as "typical."

---

[2] Claims 1, 11 and 24 read as follows:

(Claim) 1. An electric heating element arrangement for an electric oven comprising, in combination, a lower baking element and a top baking element of considerably less capacity than the lower baking element whereby an even distribution of heat is obtained within said oven, a top broiling element, all of said elements being located within said oven, and switch means for connecting said elements in a predetermined manner to a power source including means for preventing the energization of said top baking element with said top broiling element.

(Claim) 11. An electric heating arrangement for electric ovens comprising, a broiling element, a top baking element, a bottom baking element of greater capacity than said top baking element providing for substantially even distribution of heat throughout said oven, all said elements being positioned to direct heat into the oven, switch means for connecting said baking elements to a source of power, a second switch means for connecting said broiling element to said source of power and adapted to interrupt the connections from said baking elements to said source of power when said broiling element is connected to said source, and thermostatic means in circuit with the first mentioned switch means and the baking elements for also controlling the connection of said baking elements to said source to maintain a constant temperature within said oven.

(Claim) 24. An electric oven of the character described comprising a lower baking element, an upper baking element having smaller heat capacity than said lower baking element, whereby to secure balanced heat conditions within the oven space, means preventing direct radiation from said elements into said oven, means for energizing said elements, a thermostat having a portion thereof within said oven space and subjected to the heat conditions, within said oven space, means including said thermostat providing for coordinated heat control within said oven through said heating elements to connect the same to be energized when the temperature within the oven space, and effective upon the thermostat, falls below a predetermined minimum, said elements when energized supplying heat energy at a rate in excess of that required to maintain the oven with the desired temperature conditions therein, means including said thermostat for effecting deenergizing of said elements when the temperature within the oven space, and effective upon the thermostat, reaches a predetermined maximum value, said upper baking element being positioned above the level of location of the food material being baked to supply heat to be effective in the upper portion of said oven above said food and the lower baking element being positioned below the level of location of the food being baked and to supply heat to be effective within the oven and upon the thermostat therein from below said food, whereby the thermostat is effectively responsive to the desired balanced heat conditions as set up by the coordinated heating elements in the said oven space.

Claim 1 recites the relationship between the upper and lower baking elements to the effect that the top baking element is of a considerably less heat output capacity than the lower baking element. This is stated in this claim as "a lower baking element and a top baking element of considerably less capacity than the lower baking element." It also recites the means for connecting the elements together in a predetermined manner to a power source and for preventing the energization of the broiler at the same time the top baking element is energized. The connection to the source in the predetermined manner establishes the so-called "balanced heat."

Claim 11 also recites the means for maintaining the established balanced heat which is specifically stated as a thermostatic means.

In claim 24 the relationship between the heat output or capacity of the upper and lower bake elements is recited as is also the establishment and maintenance of the balanced oven heat. This claim does not recite any broiling element but it does recite the means for maintaining the balanced oven heat which has been established as being thermostatic means.

As against the validity of the claims in issue of this patent defendants urge particularly "Hotpoint R.A. 73" range as an alleged prior use; U.S. patents to Capek No. 462,532, Smith No. 1,721,191 and McCormick No. 1,672,724 and the "Hart" thermostat.

As to this Mr. McCormick (called by defendants as their expert witness) in answer to a question (Rec. p. 1061) testified that as to "Bradbury patent 2,055,246" he considered "the Hotpoint R.A. 73 range, Exhibit 537, as the best reference on prior use as shown on Chart 34, Exhibit 646W"—and as to prior art patents (Rec. p. 1060) that "In my opinion there are three patents of more or less equal value as applying to Bradbury. They are Capek 462,532, Smith 1,721,191, McCormick 1,672,724."

In this connection in arguing (and incidentally defendants stated this argument was submitted as their opening brief) their motion to dismiss (Rec. pp. 1247 et seq.)

Mr. Cooper (of counsel for defendants) stated:

"Now turn to the Bradbury patent 2,055,246. The claims are 1, 11, 14 and 24 and of those the plaintiff selected 1, 11 and 24 as typical. Now, if you will turn to Chart 36, we come at once to the point of this patent. Your Honor will recall that the Hotpoint stove made in 1925 and thereafter, that is more than two years before any date applicable to Bardbury, this particular model, was sold to the extent of 80,000 or 90,000 or something of that sort, by the Hotpoint Company, of Chicago, then known as Edison General Electric. Now, the claims of the claims of this patent do not apply at all to the defendant, for the reason that the point of this patent is the use of a third heating element at the top, which is for broiling only. The patent is very specific by constant repetition to the point that the broiler must never be on when the baking is done by the top and bottom elements. * * *

"The Court: I am a little confused, Mr. Cooper. As I understand you to say that claim doesn't read on the defendant's machine. That is getting over to the question of infringement.

"Mr. Cooper: The reason I mentioned it, if you consider the claim as broad enough to cover the defendant, then it reads on Hotpoint. That is my present point. * * * So, here we find another case where the plaintiff, if its claims apply to the defendant at all, is met by Hotpoint, which is precisely like defendant. There is no difference in the two in any respect. * * * I might as well say here that the Capek patent shown on Chart 38 has everything that is in this Bradbury patent, excepting the thermostat that is in two claims of Bradbury and on that we rely on the use of the Hart thermostat to supplement the Capek device."

*Kahn and Hake patents Nos. 2,709,-618* (Exhibit 2) and *2,123,699* (Exhibit 3).

In a general way these two patents relate to the same subject and for present purposes they may, therefore, be considered together.

Patent No. 2,079,618 is for a "Stove." The patent recites that the "invention relates to heating appliances and more particularly to a cooking stove and a heating system therefor."

The Claims in issue are 2, 3, 4, 5 and 6. Of these Claims 4, 5 and 6[3] have been designated as "typical."

These claims are drawn, generally, to an electric heating arrangement for a bake oven which includes the use of both baking and broiling heats in combination with a device for controlling the heat input into the oven for both baking and broiling. As stated in its "objects" (Spec. p. 1, col. 1, 1s. 1–25), the purpose is to provide for selective control of the baking and broiling equipment of the oven as well as the "off" position, and the setting of the thermostat, all of these operations being accomplished by a single dial. The claims of this patent are drawn to the particular structure employed to accomplish these functions.

The specification of this patent describes the structure shown in the drawing and its operation which briefly is as follows: A single control dial 20 located at a convenient point on the front of the range provides for control of the entire oven operation. The dial is marked with the regular temperature settings of the ordinary thermostat dial, these being shown in Figs. 2 and 3. In addition, auxiliary switch mechanisms are mounted in position at the side of the thermostat so that they can be actuated selectively in accordance with the setting of the control dial. Thus, switch mechanism 70 controls the broiler and is moved by a roller 80 which travels against the edge of the thermostat dial 20. This normally keeps the switch 70 in open circuit position, i. e., during the time the dial is adjusted to the "off" or to any of the temperature settings for baking, but when the dial is adjusted to the position marked "Broil," a notch 82 is brought into position opposite roller 80, and this allows switch 70 to close, thus energizing the upper heating equipment 14 in the oven for broiling.

In order to provide an "off" position for opening the circuit to the baking heating equipment 12, another switch mechanism 50 is provided which is also mounted along the side of the thermostat mechanism, with a roller 58 being arranged to engage a cam 60 on the edge of the control dial 20. The position of this cam

---

[3] Claims 4, 5 and 6 read as follows:

(Claim) 4. An electric heating arrangement of the character described and adapted to be connected to a power source comprising an oven, a baking and broiling element energizable from said power source, thermostatic control means for controlling the operation of said baking element to provide for maintaining a desired temperature within said oven, and a single control member providing for the adjusting of said thermostatic device to regulate the temperature condition within the oven, for preventing simultaneous energization of said broiling and baking elements, and for positively opening the circuit to said baking element to maintain the same in de-energized condition.

(Claim) 5. An electric heating arrangement of the character described and adapted to be connected to a power source comprising an oven, a baking and a broiling element energizable from said power source, and a single control device for controlling the operation of said oven comprising a control member operable over a range of temperature regulating positions, an off position and a broil position, means effective in the temperature regulating positions for controlling the setting of the thermostatic means to regulate the temperature within the oven, means operable in the said off position for positively opening the circuit to said baking element, means operable in the broil position for closing the broiler element circuit.

(Claim) 6. An electric heating arrangement of the character described and adapted to be connected to a power source comprising an oven, a baking and a broiling element energizable from said power source, and a single control device for controlling the operation of said oven comprising a control member operable over a range of temperature regulating positions, an off position and a broil position, means operable in the temperature regulating positions to control the regulation of the temperature within the oven, means operable throughout such position and the off position for preventing the energizing of said broiling element, and means operable in said broil position for energizing said broiling element and preventing energization of said baking elements.

60 is such that it is brought into engagement with the roller 58 only when the control dial is turned from one of the baking positions to the "off" position, and again when the dial is turned to the "broil" position. Thus simultaneous energization of the heating equipment for bake and broil purposes is prevented, and likewise the heating equipment is positively maintained in off position when the thermostat dial is so adjusted. The cam 60 is of sufficient extent to thus keep the oven bake circuit in off position when the dial is set for either off or broil, but provides for closing that circuit at all other settings of the dial, i. e., the temperature-regulating positions thereof.

The advantage claimed for this construction is that the entire control of the heating equipment of the oven for both broil and bake, including the positive opening of all the circuits in the off position of the control member and the prevention of simul-

taneous energization of the bake and broil equipment, as well as the setting of the thermostat, is all accomplished by a single control member.

Patent No. 2,123,699, also, is for a "Stove." The patent recites that the "invention relates to heating appliances and more particularly to control means for regulating an oven of a stove."

The claims in issue are 4, 5, 6 and 9. Of these Claims 4, 5 and 9[4] have been designated as "typical."

The objects of this invention are set forth at p. 1, col. 1, ls. 4–24 of the patent. On p. 4, col. ls 16–19, it is stated that "Cross-reference is made to applicants' copending Patent No. 2,079,618 issued May 11, 1937, upon an application filed concurrently herewith."

The mechanism disclosed in the drawings and its operation are described in the patent specification which, in short, is this:

---

[4] Claims 4, 5 and 9 read as follows:

(Claim) 4. An electric heating arrangement for an oven of the character described adapted to be connected to a power source comprising a plurality of heating elements energizable from said power source for supplying heat to said oven, switch means for controlling the energizing of one of said elements, thermostatic means responsive to the temperature within the oven for effecting operation of said switch means to maintain a desired oven temperature, means for positively maintaining said switch means in open circuit position, a second switch means controlling the energizing of another of said heating elements, and means for preventing the simultaneous closing of said switch means.

(Claim) 5. An electric heating arrangement for an oven of the character described adapted to be connected to a power source comprising baking and broiling elements energizable from said power source, switch means for controlling the energizing of said baking and broiling elements, thermostatic means responsive to the temperature within the oven for effecting operation of said switch means to control the energizing of said baking element to maintain a desired oven temperature, means operable from an off position to a plurality of temperature positions for adjusting said thermostatic means to maintain a desired oven temperature, means oper-

able in the off position of said adjusting means for positively maintaining said baking element switch in open circuit position, and means also controlled from said adjusting means, for controlling the energizing of said broiling element and preventing simultaneous energizing of said baking element and said broiling element.

(Claim) 9. An electric heating arrangement of the character described adapted to be connected to a power source, a heating element, a heat responsive device located in the heating zone, a double pole switch means including a plurality of stationary contacts adapted to be connected to said power source and to said heating element, and bridging means for said contacts movable to closed and open circuit position with respect thereto, operating means for said switch bridging means actuated in response to said heat responsive device, means adjustable from an off position to a plurality of operative positions for adjusting and predetermining the temperature at which said heat responsive device effects actuation of said bridging member to vary the temperature to which said heating zone is regulated, and means operated by said adjusting means in the off position thereof for preventing control of said switch bridging means by said heat responsive device and providing for maintaining both sides of said power source disconnected from said heating element.

Where in the Kahn and Hake patent 2,079,618 the circuit for the oven bake equipment was opened by a separate or auxiliary switch controlled from the thermostat dial, Kahn and Hake patent 2,123,699 provides for the opening of the circuit for the baking equipment by means of the thermostat contacts themselves. This is accomplished through the use of a cam mechanism having a roller 54, Fig. 2, which engages a projection 56 on the thermostat control dial 45 (Fig. 5). When the dial is turned to the "off" position, the projection 56 is brought into engagement with roller 54, causing it to move and this motion is transmitted by arm 50 to a lever 58 which mechanically moves the thermostat switch contacts 37 to open circuit position, and locks them in such open circuit position regardless of any action or response to heat variations which the thermostat itself may make.

Figs 6, 7 and 8 of the patent show the incorporation of the control of the broiling operation with the same mechanism, use being made of the auxiliary switch 85 which is cam-controlled from the thermostat dial 45 by means of roller 95 and groove 96 (in a manner similar to that in Kahn and Hake 2,079,618) to thereby close the circuit to the broiling equipment in the predetermined setting of the thermostat control dial which is marked "Broil." This form of the invention therefore again provides for entire control of the heating equipment of the oven for both broil and bake, including the positive opening of all the circuits in the off position of the control member and the prevention of simultaneous energization of the bake and broil equipment, as well as the setting of the thermostat is all accomplished by a single control member.

The distinction between the structures of these two patents (2,079,618 and 2,123,699) simply stated is this:

That in 2,123,699 the "off" position is established through the operation of the single control knob to its "off" position which positively opens and locks open the thermostat switch contacts themselves, whereas in 2,079,618 the "off" position is accomplished by means of an auxiliary switch mounted alongside the thermostat and controlled by the single control member.

Kahn and Hake patent 2,079,618 contains claims sufficiently broad to read upon the disclosure in the Kahn and Hake patent 2,123,699 and in addition thereto contains claims drawn specifically to the described arrangement which it discloses and which do not read upon the specific arrangement disclosed in patent 2,123,699 while patent 2,123,699 contains only claims specific to its disclosure and contains no claims which read upon 2,079,618.

The principal (but not the only) references cited by defendants against these two (Kahn and Hake) patents are Hobson patent No. 2,079,504 and the so-called "Roper Gas Range" together with NA92 Edison bake oven. As to this Mr. McCormick (Rec. pp. 1060 et seq.) testified and the record shows:

"Mr. Marechal: Q. Now which single patent do you consider to be the best reference against the Kahn and Hake patent No. 2,079,618? A. I consider the Hobson patent 2,079,504 the best reference.

"Q. And what of Kahn and Hake patent 2,123,699, which do you consider the best single patent reference? A. Likewise the same Hobson patent. * * *

"Q. Now what do you consider the best of the alleged prior uses against Kahn and Hake patent 2,079,618? A. I consider the Roper gas range, model 5B,[5] Exhibit No. 646gg, Chart No. 47. * * *

"Q. What do you consider the best single prior use against Kahn and Hake patent 2,123,699? * * * A. The two Kahn and Hake patents are so nearly identical that the Roper range referred to applies almost equally to both of them. But in the second Kahn and Hake as regards the specific details added, I consider the Edison bake oven NA92 as the supplemental prior use in that case. That is shown diagram-

[5] There actually is no "Model 5B" Roper range in evidence. Exhibit 624 is a "Model 15." The only visual thing in evidence is what appears on Chart 47, Exhibit 646gg. (rec. pp. 1061, 1062).

matically on Chart 53 and is the subject of Exhibit 646kk.

"The Court: Do we have a physical exhibit of that?

"Mr. Cooper: No.

"The Court: Do we have a photograph of it?

"Mr. Cooper: Yes, we have.

"The Court: What exhibit number is the photograph?

"Mr. Biebel: 635a to 635d.

"The Court: They came in through the deposition of Mr. Shroyer, according to my notes here.

"Mr. Byrne: That is correct. XQ102 That is the Chillicothe, Ohio, installation; is that correct? A. Yes, sir."

Other prior art patents urged by defendants to sustain their motion as against these two (Kahn and Hake) patents were: U.S. patents to McCaskey No. 1,093,003 and to Goughnour 1,931,190 and British patent No. 408,133.

In his argument on defendants' motion Mr. Cooper (Rec. pp. 1252 et seq.) stated:

"Now, let us take up Kahn & Hake patents 2,079,618 and 2,123,699. We can take those up together because the two patents are substantially alike, with the single exception that in the second Kahn and Hake patent, 2,123,699 both sides of the circuit are broken when the switch is off; whereas in the first Kahn and Hake patent 2,-079,618, only one side of the circuit is broken. * * *

"The Court: What is the advantage of having the two?

"Mr. Cooper: The advantage is a better compliance with the underwriters' rules. That is what the Kahn and Hake first patent says. It is just a matter of indifference with an electrician. He can do it either one way or the other. * * * It is a matter of supreme indifference. The statement in the second patent 2,123,699 is at page 1, second column, lines 50 and so forth. * * * Well, now, let us see what there is to that patent. We come in this patent to the Roper gas range and I will refer there to Chart 47. The plaintiff, as your Honor may recall, took Mr. Mc-

Cormick and cross-examined over all the claims and he testified again and again that aside from the opening phrase, such as 'in an electric heating arrangement,' the claims all read faithfully on the Roper gas range. * * * Now, with this understanding, let us read the typical claims of 2,079,618. Take claim 4, for example. That is one of the typical claims pointed out by the plaintiff. And keep your Honor's eye on the Hobson while I read it. * * * Now, I could weary your Honor by reading everyone of these other claims of both these patents on Hobson and we would come out to just the same end. But I want to call attention to the fact that there is yet another patent in here that your Honor will find in Chart 52, known as the McCaskey patent, and that reads on the most limited of all the claims of the Kahn patent 2,123,599. That is 646jj, or 52. That McCaskey patent was an electric heating arrangement. It was adapted to be connected to a power source. That is shown at 15 and 16 in this diagram. The power source is connected to the switching arrangement. We are dealing with, I might say, a heating element 24. That is the element that is the ultimate object of this patent. * * * That McCaskey device was a full embodiment of that claim and he (Mr. McCormick) also called attention to the Chillicothe oven built by the General Electric Company, in 1932, which was long before these patents were applied for. They were three or four years after that."

Plaintiff contends that neither the Hobson patent nor the so-called "Roper range" anticipate either of the Kahn and Hake patents in suit and that the so-called "Roper range" was not proven as a prior use, saying in its brief: "We do not have the benefit of saying, in this instance, that the Hobson patent (or the Roper range) was a file wrapper reference because it was not cited by the Patent Office and for the very good reason that by the wildest stretch of the imagination gas heating equipment and its controls cannot be considered the equivalents of electrical heating equipment and its controls of the character involved in this suit. * * * The extent to which this Hobson patent, this so-called Roper

range, and this position of defendants was so belabored, certainly justifies the assumption that the other prior art, which was apparently incidentally thrown in, is of no value. * * * Both the Roper range and the Hobson patent therefore fail as references. They do not anticipate the claims of these Kahn and Hake patents and do not negative invention therein. However, the so-called Roper range cannot, in any event, be considered in connection with these Kahn and Hake patents because it was not proved as a prior use. * * * There is not one iota of evidence in the record that any 'Roper range' was ever actually used by a customer or by anyone, that it ever satisfactorily functioned or that it ever functioned in any way, satisfactorily or otherwise. The record is simply devoid of such evidence in relation to the so-called Model 5, Model 5B or Model 15. And without such evidence, as has already been pointed out, this so-called 'Roper range' must necessarily fail as prior use of the invention of the Kahn and Hake patents in suit. * * * There is no evidence in the record as to where this Ex. 624 came from. Mr. Byrne (of counsel for defendants) simply stated that he understood it was picked up somewhere in California. * * * There is absolutely no testimony and no evidence in this record that this so-called Model 15 was ever sold or was ever used successfully or otherwise. The proofs fall far short of establishing the Model 15 as a prior use."

With respect to the Chillicothe, Ohio, installation plaintiff asserts:

"Defendants' counsel urges the Chillicothe NA92 oven built by the General Electric Company in 1932 against these Kahn and Hake patents (R. III, p. 1258). This Chillicothe oven was in a different class from a domestic oven. It was what is known as a 'commercial' oven, as pointed out by Shroyer, defendants' witness. A commercial oven is one of those very large affairs used by bakers for turning out hundreds and hundreds of loaves of bread, etc., in one baking operation. * * * This 'commercial' oven cost about $5,000.00 (Shroyer p. 105). It took almost three hours to preheat the oven from 75° to 500° (Shroyer p. 136) and Shroyer admitted that this was a completely impossible condition in a domestic range and that his company could not have sold domestic ranges if it took that long to preheat them (Shroyer p. 137). Again, it took eighteen hours for the NA92 oven to cool from 500° down to 350°, and again Shroyer agreed there was no such condition in a domestic range (Shroyer p. 141). Shroyer readily agreed that the domestic range is a tiny thing in size compared to this NA 92 oven and that the problem of heating the oven and controlling the heat in a domestic oven is very different from that in a bake oven (p. 135)."

Plaintiff makes the following observations regarding McCaskey Patent No. 1,-093,003 (and incidentally to the Goughnour patent 1,931,190 and British patent 408,133):

'This is not an anticipation of either of the Kahn and Hake patents nor does it negative invention therein. It is a fireless cooker, the chamber of which is heated by electrical resistance wire. When the heat reaches a predetermined degree the automatic switch mechanism shown in Fig. 2 of McCaskey releases and flies open under the action of a spring. The release is controlled by a bi-metal thermostat with the switch mechanism having previously been cocked by hand and never again comes into operation unless again manually cocked. The McCaskey patent structure differs from the Kahn and Hake structures because it is not 'an elecrical heating arrangement of the character described' in either of these patents to Kahn and Hake and because in these patents the heating arrangement described is the type of bake oven in which the heating elements are automatically turned on and off intermittently during the baking operation to maintain an even temperature and even heat conditions in the oven. In McCaskey when the cocked switch once flies open, as defendants' counsel puts it in another connection, 'that is that.' * * * The other references referred to by defendants' counsel are the Goughnour patent, Def. Ex. 6450, and the British patent 403,133, Def. Ex. 645T, which are said to show simply single knob thermostats. The claims of the Kahn and Hake patents in suit do not simply claim single knob thermostats and there is no

contention that this Goughnour patent and this British patent anticipate the Kahn and Hake claims and indeed we do not have the benefit in either Mr. McCormick's testimony or defendants' counsel's argument (R. III, pp. 1259, 1260) of knowing how they intend to use this Goughnour or this British patent. They are simply thrown in. It is therefore our position that the claims of both the Kahn and Hake patents are valid and have been shown to be valid by defendants' failure to find anything in the art which even remotely approaches them."

*Kahn patent No. 1,786,429* (Exhibit 4) is for a "Door." The patent recites that the "invention relates to metal doors such as are used in oven constructions and the like."

The claims in issue are 4, 5, 6, 8, 15 and 18. Of these Claims 6, 15 and 18 [6] have been designated as "typical."

The construction of this Kahn patent is described in the specification and illustrated in the drawings. The construction is particularly in a door which has a relatively light enameled front finish plate as well as hinge mechanism and counter-balancing mechanism. The object of the invention is, as stated in the specification (p. 1, col. 1, first three paras.) to provide a door construction which has a front enameled finish plate and a rigid back plate which plates are so associated that all of the strains incident to the opening and closing of the door on its hinge and by the counterbalance mechanism, will be taken by the more rigid back plate, with the result that the enamel of the front finish plate will not be cracked during use. Moreover, the rigid back panel of the door and the thinner front enameled finish panel are so connected together that none of the hinge or counterbalancing mechanism or their attaching means or the means for securing the two panels together will be visible from the front of the door. (Spec. p. 1, col. 2, lines 84-93.)

Before enameled finish plates were used and when it was quite common to use heavier steel front and back plates, as examplified by the Moll patent (Ex. 645K) there was no necessity for protecting the front plate against strains incident to opening and closing of the door. But, when the doors were equipped with the lighter finish, enameled front plates the need for a construction wherein all of the strains would be taken and absorbed by the heavier back plate arose. The evidence shows that it was a real problem and that it was solved by this Kahn patent.

Referring to this patent Mr. McCormick (Rec. pp. 1059 et seq.) testified:

"Q. And which do you consider to be the best reference against the Kahn patent in suit 1,786,429? A. I consider the Moll patent 1,677,286 the best reference.

"Q. Now, as to the Kahn patent in suit 1,786,429, which do you consider the best single prior use? A. Here also I consider the E-Zest Way range.

---

6 Claims 6, 15 and 18 read as follows:

(Claim) 6. An oven door comprising a rigid back plate, hinge means fixed to said back plate, a front enameled plate spaced from said back plate and having peripheral flanges extending toward the back of the door, and attaching means accessible only from the back of the door for fastening said plates together so that the front plate is substantially free from stress in normal door movements, said attaching means being entirely independent of said hinge means.

(Claim) 15. An oven door comprising a rigid flanged back plate, spaced fulcrum pieces fixed to said back plate and projecting through one of its flanges, a front finish plate supported on said back plate and spaced therefrom and peripherally flanged, the finish plate being substantially coextensive in size with the back plate on three edges and projecting a substantial distance beyond the back plate adjacent the projecting portions of said fulcrum pieces to cover them from view.

(Claim) 18. An oven door comprising a back plate of substantially rigid construction assuming substantially all the door strains, a front finish plate of lesser rigidity spaced from said back plate, means for detachably fastening said front and back plates together, a door counterbalance, a metal reinforcing plate attached rigidly to said back plate and free from direct attachment to said front finish plate to provide an anchorage for the door counterbalance, and hinge means fixed to said reinforcing plate and said back plate and free of direct connection to said front finish plate.

"Q. That is the same Exhibit 514 in Chart 28 you just referred to? A. Yes, sir."

In his argument Mr. Cooper (Rec. pp. 1239 et seq.) said: "Now, turn to the Kahn patent in suit, 1,786,429. That is on a door construction, and claims 6, 15 and 18 were picked out by my adversary as being typical claims. Now, that construction is perfectly easy to see from Chart 16. Your Honor will recall that the Kahn patent says that the door is made up of two panels, one which it calls a rigid panel, which is on the inside and is marked 11 on these drawings, and the other is a finished panel on the outside; that is marked 16 on these drawings. The two parts are shown dissociated in the lower part of this chart and they are shown assembled in the upper part of the chart. Now let me read that claim 6, the typical claim on this construction, while 16-K is before your Honor. * * * Now, turn to 24, which is 646q, I believe, and there you find the claim applied to the Moll prior patent, which was filed two months ahead of Kahn's date. * * * So, I say, here again there is in the first place a practical identity between the reference and what is claimed and beyond· that there is a substantial identity between that which is shown in the patent and that which is in the prior patent, so close that if there were any spicula of difference between the two, there is nothing· in the record to show ·that that amounts to a patentable invention. On the contrary, Mr. McCormick testified that the two constructions were substantially identical and that is that. * * * I should like to go back to the patent in suit 1,786,429 to Kahn, because I neglected to call your attention to the E-Zest Way stove of the Fitch patent, * * * There is one item of differentiation but only one and in that respect the defendant is like the Fitch patent in every respect. It is like the Fitch patent· including that one and is different in that respect from the Kahn patent in suit."

Referring to the patents here testified to, plaintiff says:

"As against the Kahn Patent 1,786,429 in suit (Ex. 4), defendants urge the Moll patent 1,677,286 (Ex. 645K). This patent was originally cited by the Patent Office (Ex. 107) against the Kahn application on which this Kahn patent issued and it was withdrawn as a reference against this Kahn invention and ·the claims of the Kahn Patent 1,786,429 were allowed by the Patent Office as expressing patentable invention over the disclosure of the Moll patent. Defendants also urge the Fitch Patent (Ex. 6451) 1,621,500 and the alleged E-Zest Way stove (Ex. 514; Ex. 511). * * *

"The whole object of the Moll invention is exactly opposite to the object of the invention of the Kahn patent. Kahn created a construction in which the hinge . mechanism, counterbalancing mechanism and door handle were all carried by the rigid back plate leaving the front enameled finish plate free from any strains that result from the opening and closing of the door. On the other hand as Moll explains in his patent specification the handle is secured to the front plate 11 (p. col. 1, 1. 105, 106), and the arms 13a of the hinge members are directly connected to the handle by the bolts 25 and to· the front plate of the door. * * * Moll was attempting to have all of the strains carried by the front rigid steel panel of the door whereas, in the Kahn construction, all of the strains incident to the opening and closing of the door were carried by the back rigid plate and the front enameled plate was a finish plate free from strains which crack and mar the enamel. Certainly these claims differentiate from Moll and express patentable invention thereover. It is not difficult to understand why the Patent Office allowed this Kahn patent over the Moll patent. * * * This patent can have no possible relevancy.

"However, apparently in an endeavor to build up this patent structure and give it some virtue that it does not possess to make it appear to teach something that it does not teach, this unjustifiable chart 24 was contrived and on which chart defendants (R. III, p. 1240) attempted to read claim 6 of the patent.

"Defendants also rely upon Fitch Patent No. 1,621,500 (Ex. 6451). The Fitch pat-

ent· (Ex. 6451) No. 1,621,500 fails as a reference against this Kahn patent 1,786,-429 because here again, the hinge piece 24 (Figures 2 and 3) is connected by means of a rivet 27 to a clip 28 which is welded at 29 (see Figure 3) to the side and bottom flanges of the front panel of the door. And the link 41 (Figure 2) is likewise connected by rivet 45 to this same clip 28. Therefore, all of the strains incident to the operation of the hinge and counterbalancing mechanism and the opening and closing of the door are transmitted directly to the front panel which is exactly the opposite of what is done in the Kahn construction."

As shown by the Record, pp. 840 and 1176, et seq., plaintiff objected to the admission in evidence of the so-called E-Zest Way Stove (Ex. 514) and of the photostats and photographs concerning it (Exs. 509-513) on the ground that the stove "has not been proven." It was agreed (Rec. p. 1178) that the Court should pass on this objection when it came "to pass on the case." Plaintiff now urges its objection and moves to strike the exhibits referred to from the record as evidence.

Upon a consideration of the record with respect to these exhibits the Court now finds that plaintiff's objection is well taken as is its motion to strike, and that both the objection and the motion should be and they are both and each sustained. The Court has not considered any evidence regarding the E-Zest Way Stove in arriving at its Findings and Conclusions in this case.

*Kahn Patent No. 1,717,221* (Exhibit 5) is for a "stove." The patent recites that the "invention relates to door mountings, and particularly to door mountings adapted for use on stoves."

The Claims in issue are 13 and 14.[7] Neither has been designated as "typical."

As to this patent Mr. McCormick (Rec. p. 1059 et seq.) testified that he considered "Gummer patent 997,550 the best reference" against it and that he considered "the Clermont range, Exhibit 508, the best prior use with reference to Kahn 1,717,221."

In support of his motion defendants' counsel (Rec. p. 1234) stated: "Now, first, as to the Kahn patent 1,717,221, Mr. McCormick, with reference to Chart 5, which is Exhibit 646c, pointed out for the first time in this litigation, if your Honor please,—Mr. McCormick pointed out when he was called by the defendant that patented construction and then called attention to the Clermont range, and he showed that the Clermont range was sold in 1922, three years ahead of the exhibit blueprint introduced by Mr. Marechal in his statement, and more than three years before the patent was applied for, the Clermont range was sold. That has every element of both of the claims that are in suit. I will read them and point it out to your Honor. That is Chart 5 or Exhibit 646c. * * * I say that that is as clear as a bell that that patent is invalid and there can be no doubt about it. Why should this Court be bothered about anything excepting the plain indication from the Clermont range, which was fully proved to your Honor, and which is not attacked here?"

As to the Gummer plant and the Clermont range prior use plaintiff submits: "This patent is directed to a door construction and more particularly to the counterbalancing arrangement therefor. * * * Kahn was not the first one to provide such an oven door with spring counterbalancing mechanism but he did make a specific im-

7 These claims read as follows:

(Claim) 13. In a stove, a hollow main body portion comprising a side wall having an opening therethrough, a door for closing said opening, means on said stove for movably supporting said door, and yielding means disposed below the bottom wall of said main body portion so as to be freely accessible from below and connected with said door so as to tend to draw the door to closed position.

(Claim) 14. In a stove, a hollow main body portion comprising a side wall having an opening therethrough, a bottom wall, a door pivotally mounted on said stove for closing said opening, and a spring disposed below said bottom wall, and freely accessible from the bottom of the stove and connected with said door so as to tend to draw the same to closed position, and means freely accessible from the bottom of the stove and located below the bottom wall for adjusting the effect of said spring.

provement in the counterbalancing arrangement for doors of the type above referred to. * * * This is a simple invention, but it is a meritorious advance of the art and tribute is paid to it by McCormick in his patent 2,308,768 (Ex. 42)."

*Wells Patent No. 1,785,568* (Exhibit 6) is for a "Gas Range." The patent recites that the "invention comprehends a novel construction of a gas range and more particularly novel means for hinging the doors so that they will have fixed pivots," and "a novel construction and arrangement of door counterbalancing mechanism."

The Claims in issue are 1, 2 and 3.[8] Neither is designated as "typical."

With regard to the claims of this patent, Mr. McCormick (Rec. p. 1059 et seq.) testified:

"Q. Now which single patent do you consider to be the best reference against the Wells patent in suit No. 1,785,568? A. I consider the Morgan patent 1,723,704 the best reference. * * *

"Q. Which do you consider the best single prior use against Wells patent in suit 1,785,568? A. I consider the E-Zest Way door or range, Exhibit 514, the best example of prior use with reference to Wells."

(As hereinabove stated the Court has ruled that Exhibit 514 should be and it has been stricken from the record. It is no longer evidence in the case and has not been considered by the Court in connection with Wells patent No. 1,785,568 nor in arriving at its ultimate conclusion.)

Defendants attack the validity of this (Wells) patent upon two grounds (1) that the specification is "Unclear" and (2) because of prior art patent to Morgan No. 1,-723,704. As to this, Mr. Cooper (Rec. p. 1236) stated: "Next as to the Wells patent, that is the patent whose specification is so unclear that even the plaintiff didn't read it or pay any attention to the specification in its proofs. It took no proof on the subject and on the contrary the defendant not only explained the patent to your Honor, but explained the shortcomings of its specification, as, for example, where in one line it speaks of the webs 15 and in another line speaks of the webs 25; where it speaks of standards 2 which are not standards at all, but are merely the outside of the stove or the frame of the stove, and other things of that sort, which, to put it mildly, are very infelicitous. * * * This so-called improvement is shown in Chart 6. If your Honor will bear with me while I read a claim of the patent. * * * Well, your Honor can see exactly what that situation is. The same parts in Morgan as in the Wells patent. It is a very similar thing. There is a door with pivot pins so that it will move up and down and with little openings through which the webs of the door project into the inside of the oven. And those have stops on them 15 as a part of the web, just as in the patent in suit. So when the door is opened all the way down, as in Fig. 4, those stops prevent the door from going any lower; they just stop it there. So, I say, here again Mr. McCormick is absolutely correct in saying that there is nothing in this Wells patent that is not fully shown in the Morgan patent."

---

8. These claims read as follows:

(Claim) 1. A gas range having standards and a front wall provided with a door opening, a door to close said opening and have rearwardly extending arms, pivot pins passing through said arms and journalled on said standards and having deflected portions, said door having means to limit longitudinal movement in one direction of said pins and a lining for the door overhanging said deflected portions to retain said pivot pins in assembled position.

(Claim) 2. A gas range having standards and a front wall provided with a door opening, and with side openings adjacent opposite sides of said door opening, webs on the sides of said door at its rear end to pass through and substantially fill said side openings, arms connected with the rear end of said door at the sides, and pivot pins for said door and carried by said standards in rear of said front wall.

(Claim) 3. A gas range having standards and a front panel provided with a door opening, a door to close said opening and having rearwardly extending arms, said panel surrounding said door opening and being inwardly and laterally deflected to form a seat for the door and provided with side openings through which said arms extend, and pivot pins passing through said arms and journalled on said standards.

Regarding the Wells patent plaintiff asserts:

"Before showing that the prior Morgan patent does not invalidate the Wells claims because it does not even purport to show corresponding parts, and before pointing out why we think claims 1 and 3 were not read by defendants' counsel, we will discuss and dispose of these criticisms by Mr. McCormick which defendants' counsel says makes the specification 'unclear.' * * *

"This attempt of McCormick to establish that the Wells patent in this respect is what defendants' counsel calls 'unclear' simply falls by its own weight and is destroyed by McCormick's own testimony. * * * Certainly, there is nothing 'unclear' about this Wells disclosure. It contains an accurate drawing and an ample description, and McCormick's criticisms are totally unjustifiable. In fact his discussions of the Wells and of the Morgan patents makes it quite clear that he understood the Wells construction perfectly well.

"The Wells invention, as disclosed in the specification, comprises a range which has the usual front standards for supporting it and the usual front panel with a deflected portion against which the door seats in a flush condition. * * * This construction which has above been described, and which is clearly described in the Wells patent specification, is specifically recited in Claim 1 of the Wells patent. This would seem to be a simple invention and indeed it is, but it is novel and it is patentable. Its simplicity does not defeat its patentability. * * *

"We confidently and sincerely assert that Claim 1 is not anticipated by the Morgan patent nor is invention in it negatived by the Morgan patent. Now, referring to Claim 3, we see that this recites the pivot pins as passing through the arms. In Morgan the pivot pins do not pass through the arms. * * * This claim is valid because this feature in the combination claimed is not disclosed in Morgan. * * * It is also our position that the Morgan patent does not anticipate or negative invention in Claim 2 of this Wells patent because it does not disclose or suggest the cooperative relationship between the rearwardly extending webs or arms and the slots through which they pass. Here again this may seem a simple invention but it does assist in maintaining the door in alignment which Mr. McCormick in his patents above referred to says is important. This Wells invention solved a definite problem— proper hinging and alignment of the door and it materially added to the art."

In view of all of the foregoing and upon a consideration of the whole of the record as presently before it; the briefs and arguments of council and the applicable law, the Court has arrived at the following:

Findings of Fact:

(1) This is an action instituted under the patent laws of the United States.

(2) The plaintiff, The Estate Stove Company, is an Ohio corporation, having its principal place of business in Hamilton, Ohio. The plaintiff, Noma Electric Company, is a Maryland corporation. The defendant General Motors Corporation, is a Delaware corporation and has a regular and established place of business at Dayton, Montgomery County, Ohio. The defendant, General Motors Sales Corporation, was a Delaware corporation and had a place of business at Dayton, Montgomery County, Ohio.

(3) The plaintiff, The Estate Stove Company, filed its original complaint herein on March 14, 1941. The defendants named in Finding No. 2 were served on March 20, 1941.

(4) The action originally was commenced by the plaintiff, The Estate Stove Company, against defendants, General Motors Corporation and General Motors Sales Corporation.

(5) The defendant, General Motors Sales Corporation, was liquidated on December 31, 1941. At the trial it was stipulated in the record (Tr. p. 14) by defendant, General Motors Corporation, that "the sales organization was a wholly owned subsidiary of General Motors, which at all times is responsible for anything the sales organization did. When it was wiped out, it was just as though the suit was against General

Motors solely and it was responsible for anything that is done."

(6) The complaint, as originally filed, and as amended (and as now before the Court), charges defendants with infringement of the following patents and claims:

| Named Inventor | Number | Date | Claims |
|---|---|---|---|
| (Ex.1) Bradbury | 2,055,246 | Sept. 22, 1936 | 1, 11, 14, 24 |
| (Ex.2) Kahn and Hake | 2,079,618 | May 11, 1937 | 2, 3, 4, 5, 6 |
| (Ex.3) Kahn and Hake | 2,123,699 | July 12, 1938 | 4, 5, 6, 9 |
| (Ex.4) Kahn | 1,786,429 | Dec. 30, 1930 | 4, 5, 6, 8, 15, 18 |
| (Ex.5) Kahn | 1,717,221 | June 11, 1929 | 13, 14 |
| (Ex.6) Wells | 1,785,568 | Dec. 16, 1930 | 1, 2, 3 |

(7) Subsequent to the institution of this action, to-wit, on July 31, 1946, the plaintiff, Noma Electric Company, became and now is vested with title to the letters patent of the United States referred to and set forth in Finding No. 6.

(8) On motion of plaintiff, The Estate Stove Company, and with the consent of defendants, Noma Electric Corporation, was joined as a party plaintiff for the purposes of this action; whereupon Noma Electric Corporation submitted itself to the jurisdiction of this Court, to all pleadings filed and all proceedings taken by defendants to the date of its submission, and Noma Electric Corporation adopted, as its own, all pleadings filed and proceedings and actions taken by plaintiff, The Estate Stove Company; on May 28, 1947, an amended complaint was filed and it was agreed that defendants' pleadings already filed, and proceedings and actions taken by plaintiff, should apply to the amended complaint.

(9) This Court is vested with jurisdiction over the parties to this action and of the issues of the claims under the complaint.

(10) At the conclusion of the trial(Rec. p. 1233), defendants moved to dismiss the complaint with respect to the charge of patent infringement, on the ground that all of the patents in suit, with respect to all of the claims thereof, here relied upon by the plaintiff, are invalid.

(11) The cause is now before the Court on defendants' motion referred to in Finding No. 10.

(12) Plaintiff, The Estate Stove Company (under other names from time to time), has been in the business of manufacturing and selling ranges for over a hundred years and electric ranges for at least thirty-five years, or since about 1911. Defendants together have been in the business of manufacturing and selling domestic electric ranges from about November, 1937.

(13) Bradbury patent No. 2,055,246, in suit (Exhibit 1), is for "Electric Range." The patent states that the "invention relates to the arrangement and control of heating elements for electric ranges." Insofar as this suit is concerned, it relates to an oven for an electric range which has upper and lower baking heating units which are manually connected to, and disconnected from, the electric power source by a single switch which controls them both, simultaneously. The upper unit in operation has a lesser baking heat output than the lower unit and the relationship between the baking heat output of the upper and lower units is a nonvariable, fixed and predetermined relationship which may not be changed by the user and which, in operation, always gives a "uniform oven heat" or "proper heat balance" or, as plaintiff has termed it, "balanced heat," within the oven for baking. An automatic control, such as a thermostatically controlled switch, connected into the oven circuits, turns the upper and lower baking units on and off intermittently, automatically and simultaneously during a baking operation to maintain the same balanced heat re-

lationship in the oven at all times during a baking operation and to maintain the oven at substantially the selected degree of temperature setting. The invention also includes the use of a broiling heat within the oven which is likewise controlled by the single switch that controls the upper and lower baking units as above explained, in such manner that the broiling heat may not be used simultaneously with the baking heat, thus preserving the balanced heat relationship within the oven during the baking operation.

(14) Kahn and Hake patent No. 2,079,-618 in suit (Exhibit 2) is for "Stove." The patent states that the "invention relates to heating appliances and more particularly to a cooking stove and a heating system therefor." Kahn and Hake patent No. 2,-123,699 in suit (Exhibit 3) also is for "Stove." The patent states that the "invention relates to heating appliances and more particularly to control means for regulating an oven of a stove." Both Kahn and Hake patents just referred to, to-wit, patents Nos. 2,079,618 and 2,123,699, relate to improvements upon the electric range baking oven and the heating equipment of the Bradbury patent No. 2,055,246. These Kahn and Hake patents each provide a single handle or knob for manipulation for connecting the upper and lower heaters to, and disconnecting them from, the electric power source as in Bradbury, and also for simultaneously adjusting the thermostat mechanism to the desired temperature setting; all of these operations being selectively accomplished by manipulation of a single handle or knob. In each of these Kahn and Hake patents the switch mechanism and the thermostat mechanism are so interconnected and construed that the entire control of the oven heating for the intermittent and simultaneous energizing of the upper and lower heaters for the balanced heat baking, the energizing of the upper heater alone for broiling heat, the "off" position, and for setting the thermostat for the selected temperature or degree are all accomplished by manipulation of a single handle or knob, this construction including means for preventing energizing for the baking heat and the broiling heat at the same time. However, in Kahn and Hake No. 2,123,699 manipulation of a single control handle or knob to its "off" position causes the control mechanism to open, and to hold open, the thermostat switch to cause and assure disconnection from the electric power source. Whereas in Kahn and Hake No. 2,079,618 the switch and thermostat control mechanism include a separate or auxiliary switch which is also under control of the single handle or knob and which is cammed open and held open when the knob is moved to "off" position, to cause and assure the disconnection from the power source.

(15) In each of these Kahn and Hake improvements, (patents Nos. 2,079,618 and 2,123,699) when the handle is manipulated to "bake" position the upper and lower heaters are connected to the electric power source, and the thermostat set for the desired temperature or degree, to attain and maintain the balanced heat for baking in the oven. When the handle is moved to broil position, the baking heaters are simultaneously disconnected from the power source and the upper heater connected to the power source for broiling heat, and the thermostat set to its hightest temperature setting. And, in each of them, when the handle is manipulated to the "bake" position and the selected thermostat setting or temperature, the upper and lower heaters are simultaneously connected to the power source through the thermostat and are energized to bring the oven up to the balanced heat baking condition before the foodstuffs are introduced into the oven for baking—this being the so-called "preheat" —and thereafter the thermostat will automatically and intermittently turn both the upper and lower heaters off and on, simultaneously, in the fixed relationship of lessor heat output from above and greater heat output from below to maintain the balanced heat for baking.

(16) Kahn patent No. 1,786,429, in suit (Exhibit 4), is for "Door." The patent states that the "invention relates to metal doors such as are used in oven constructions and the like." It relates to the construction of an oven door which is particularly useful in connection with a baking oven of

the Bradbury type. The invention disclosed in this patent is directed to an oven door which has a heavy back panel or plate and a light enameled front finish panel. The door is formed of a rigid inner plate 11 and an outer "finish" plate 13 with mutually telescoping flanges 12 and 16. The two plates are spaced apart by the flanges and they are secured together by means of screws accessible from the rear of the door. A reinforcement is provided for the rear plate and to this reinforcement is secured a counterbalance link 48 and a hinge generally indicated 28. The hinge mechanism and the counterbalancing mechanism of the door are both connected to the heavy back panel or plate so that all of the strains incident to the opening and closing of the door will be absorbed by the heavy back panel and so that the strains incident to the opening and closing of the door which would tend to crack and mar the enamel of the front finish plate are not transmitted to the front finish plate.

(17) Kahn patent No. 1,717,221, in suit (Exhibit 5), is for "Stove." The patent states that the "invention relates to door mountings, and particularly to door mountings adapted for use on stoves." The claimed invention is directed, generally speaking, to a spring counterbalance which is connected to the door and the spring of which is located below the heat zone of the oven. The force exerted by the spring may be adjusted by means of an adjuster operating on a bolt which passes through the coil spring and is connected to the door. The adjuster is located below the heat zone and both the adjuster and spring are accessible from below the heat zone or bottom of the stove.

(18) Wells patent No. 1,785,568, in suit (Exhibit 6), is for "Gas Range." The patent states that the "invention comprehends a novel construction of a gas range, and more particularly novel means for hinging the doors so that they will have fixed pivots" and "a novel construction and arrangement of door counterbalancing mechanism." It is directed to a hinge mechanism for an oven door which is useful on either gas ovens, electric ovens or on doors for similar uses. The invention of this patent, generally speaking, resides principally in the provision of a hinge device including removable pins which are carried by the door and slide into bearings in the corners or standards of the range. The pins are easily engaged or withdrawn from their bearings in the standards for application or removal of the door and they are provided with deflected portions which are held in predetermined positions by the lining of the door to prevent the accidental displacement of the pins. This construction is advantageous in maintaining the door in proper alignment for proper closing, a feature which is particularly useful in connection with a bake oven.

(19) Defendants have manufactured and sold, within the Southern District of Ohio, electric ranges having electrically heated bake ovens, as exemplified by defendants' ranges known as Model "B–60–40" (Exs. 8, 9a to 9h) and Model "B–60–41" (Exs. 10, 60a to 60h). The charge of the infringement of the claims in issue of the letters patent in suit is based upon the manufacture and sale of these electric ranges, so exemplified and so manufactured and so sold.

(20) Defendants, in their answer and in the amendments thereto, pleaded a number of prior patents and alleged prior uses against the patents in suit, and, at the trial, offered evidence directed to the "Clermont" alleged prior use range (Ex. 508); to the "E-Zest Way" alleged prior use range (Ex. 514); to the "Hotpoint RA 73" alleged prior use range (Ex. 537), and numerous other ranges of the same type that were manufactured by the Edison General Electric Appliance Company and its predecessor companies; to the "Crawford" alleged prior use range (Ex. 542); to the "Hart" thermostat switches; to the "Wilwear" alleged prior use range (Ex. 609); to the "Electrochef" alleged prior use range (Ex. 623); to the "Roper Gas Range" alleged prior use range (Ex. 624); to the "NA 92 Edison" bake ovens alleged prior use ovens (Exs. 638 and 639); and to the "Wilcolator" thermostatic control. Defendants also offered in evidence, during the trial, (in a book Ex. 645) British

patent No. 408,133 and United States patents to:

| Name | Number |
|---|---|
| Price | Re. 19,364 |
| Capek | 462,532 |
| Gummer | 997,550 |
| McCaskey | 1,093,003 |
| McBride | 1,301,582 |
| Wilkinson et al. | 1,511,700 |
| Toomey | 1,581,702 |
| Weir | 1,604,433 |
| Fitch | 1,621,500 |
| McCormick | 1,672,724 |
| Moll | 1,677,286 |
| Moecker | 1,699,403 |
| Smith | 1,721,191 |
| Morgan | 1,723,704 |
| Goughnour | 1,931,190 |
| Kahn | 1,972,739 |
| Hobson | 2,079,504 |
| Fonseca | 2,125,627 |
| Myers et al. | 2,140,479 |

(21) While the Court entertains some doubt as to whether the "Roper Gas Range" was proven to have existed prior to the application dates of the patents in suit against which it is urged, it has resolved that doubt in favor of defendants' contention and has considered the construction of the "Roper range" in arriving at its Findings and Conclusions.

(22) Plaintiff's motion to strike Exhibit 514 (the so-called E-Zest Way Stove) and Exhibits 509-513 inc. (photostats and photographs concerning Exhibit 514) from the record as evidence in this case, having been sustained, the Court has given no consideration to these exhibits or any evidence pertaining thereto in arriving at its Findings and Conclusions.

(23) In their presentation and argument on their motion to dismiss referred to in Finding No. 10, defendants' counsel stressed and particularly relied upon the following prior patents and alleged prior uses to sustain the motion:

Against Bradbury No. 2,055,246, in suit (Exhibt 1):

"Hotpoint RA 73" range, alleged prior use; U. S. Patent to Capek 462,532; "Hart" thermostat;

Against *Kahn & Hake* No. 2,079,618, in suit (Exhibit 2):

U. S. Patent to Hobson 2,079,504; U. S. Patent to McCaskey 1,093,003; U. S. Patent to Goughnour 1,931,190; British patent 408,133; "Roper Gas Range", alleged prior use; "NA 92 Edison" bake oven, alleged prior use.

Against *Kahn and Hake* No. 2,123,699, in suit (Exhibit 3):

U. S. Patent to Hobson 2,079,504; U. S. Patent to McCaskey 1,093,003; U. S. Patent to Goughnour 1,931,190; British patent 408,133; "Roper Gas Range," alleged prior use; "NA 92 Edison" bake oven, alleged prior use.

Against *Kahn* No. 1,786,429, in suit (Exhibit 4):

U. S. Patent to Moll 1,677,286; U. S. Patent to Fitch 1,621,500; "E-Zest Way" range, alleged prior use;

Against *Kahn* No. 1,717,221, in suit (Exhibit 5):

"Clermont" range alleged prior use.

Against *Wells,* No. 1,785,568, in suit (Exhibit 6):

U. S. Patent to Morgan 1,723,704.

(24) *As to Bradbury patent in suit No. 2,055,246,* (Exhibit 1):

Claims 1, 11, 14 and 24 here in issue do not all or any of them read (as claimed by defendants) "in terms and spirit upon the Hotpoint Electric range RA-73"; they are not anticipated by the patent to Capek No. 462,532, nor would (as also claimed by defendants) "the embodiment of such a thermostat as made by the Hart Manufacturing Company, in the electric heating circuit of the oven shown in the Capek patent No. 462,532" alter the situation.

(25) No one, prior to Bradbury, had produced an electric range having a bake oven with oven heating equipment and controls provided with upper and lower baking heaters with a food space between them and both under control of a single handle or knob in which for baking heat both the upper and lower heaters were necessarily connected to the electric power source to be energized with the upper heater operating at lower heat output and the

lower heater at higher heat output, for baking; the single manipulator being operable also to move the switch mechanism to disconnect the upper and lower heaters simultaneously from the "baking heat" connection to the power source and to position a switch member to connect the upper heater only for high heat output from above for broiling, and to move the switch mechanism to still another, "off," position to disconnect the oven heaters from the power source for non-operation of the oven. Nor had anyone prior to Bradbury produced such an electric range with an oven system provided with a single handle or manipulator and with such switch mechanism controlled thereby for connecting the upper and lower heaters to the electric power source as stated, and with the connections for the upper and lower heaters, during the "baking" position of the switch mechanism, including also a thermostat for automatically and intermittently, and simultaneously, making and breaking the connection between the upper and lower heaters and the electric power source, for producing and maintaining balanced heat for baking within the oven space and at all times effective upon the foodstuffs being baked in the oven.

(26) *As to the two Kahn and Hake patents (Exhibits 2 and 3), numbered 2,079,-618 and 2,123,699 respectively.*

(a) The inventions of these two patents are along somewhat similar lines. In both patents the switch means controlling the broil heater and the setting of the thermostat switch for controlling the bake heater to maintain the selected bake temperature in the oven, are all operated by a single knob. In both patents the broil heater and the bake heater are separate and independent of one another and cannot be energized at the same time. In both patents it is asserted that when the knob is in the "off" position the oven is disconnected from both sides of the power lines. One difference between the two patents is that in the second patent (No. 2,123,699) the thermostatic switch is a double pole switch which acts as the line switch for the bake heater, whereas in the first patent (No. 2,079,618) the thermostatic switch is a single pole switch.

(b) The gas range identified by the name "Roper" (Exhibit 624), is made according to and embodies the asserted invention of United States patent No. 2,-079,504 granted May 4, 1937, to S. H. Hobson on an application filed May 8, 1934.

(c) Claims numbered 2, 3, 4, 5 and 6 here in issue of Kahn and Hake patent No. 2,079,618 in suit, and claims 4, 5, 6 and 9, here in issue, of Kahn and Hake patent 2,123,699 in suit, do not (as defendants claim) "read in terms and spirit upon the Roper range or upon the device shown in Hobson patent 2,079,504."

(d) An electric oven made by Edison General Electric Appliance Company of Chicago, Illinois, identified as NA–92, was installed in the Veterans Hospital, Chillicothe, Ohio, in the year 1932.

(e) Claim 9, here in issue, of Kahn and Hake patent No. 2,123,699 in suit, does not (as claimed by defendants) read "in terms and in spirit upon the NA–92 electric oven."

(f) Claim 9, here in issue, of Kahn & Hake patent No. 2,123,699 in suit, does not (as claimed by defendants) read "in terms and in spirit upon the disclosure of the McCaskey patent No. 1,093,003."

(g) None of the claims here in issue of the two Kahn and Hake patents in suit are (as defendants assert) "invalid for double patenting."

(27) *As to Kahn patent No. 1,786,429 in suit (Exhibit 4), of which claims 4, 5, 6, 8, 15 and 18 are in issue.*

The claims in issue of this Kahn patent No. 1,786,429 do not (as defendants submit) "read in terms and spirit upon Moll patent 1,677,286." The elements recited in the claims in issue of this Kahn patent are not of the same construction nor of the same mode of operation and they do not produce the same results as the elements of Moll patent No. 1,677,286. The claims in issue of this Kahn patent do not read in terms or spirit upon Fitch patent No. 1,621,500.

(28) *As to Kahn patent No. 1,717,221 in suit (Exhibit 5), of which claims 13 and 14 are in issue.*

(a) The claimed (claims 13 and 14) invention of this Kahn patent consists of a

hollow body portion (an oven) having an opening, a door for closing said opening, supporting means on the stove for movably supporting the door, an adjustable spring (yielding means) disposed below the bottom wall of the body portion to be freely accessible from below and connected with the door and to tend to draw the door to closed position.

(b) The coal or wood burning cook stove or range, identified by the name "Clermont," exemplified in Exhibit 508, was made and sold by the Gem City Stove Company of Dayton, Ohio, more than two years prior to the filing of the application for the Kahn patent No. 1,717,221. One of such ranges (Exhibit 508) was purchased by a user during the week of October 22, 1922. That Clermont range had a hollow body portion (an oven) having an opening, a door for closing the opening, supporting means on the stove for movably supporting the door, and an adjustable spring (yielding means) disposed below the bottom wall and freely accessible from below. The spring was connected to the door to tend to draw the door to closed position.

(c) The yielding or spring means of the "Clermont" range is similar to that shown and described in the Gummer patent No. 997,550, assigned to the Gem City Stove Company, and consists of a hook pivoted to the door, a rod connected at one end to the hook and at its other end to one end of a pivoted lever. To the other end of the pivoted lever is attached a second rod, parallel with the first rod, and surrounded by a spring adjustable by a nut screw threaded onto the outer end of the second rod. This adjusting nut is freely accessible from beneath the "Clermont" range which is mounted upon legs.

(d) The elements recited in claims 13 and 14 here in issue of Kahn patent No. 1,717,221 in suit, are of the same construction and mode of operation and produce the same results as the corresponding elements of the "Clermont" range. These claims read in terms and spirit upon the Clermont range and do not define a patentable invention over the Clermont range.

(29) *As to Wells patent No. 1,785,568 in suit (Exhibit 6), of which claims 1, 2 and 3 (being all of the claims of the patent) are in issue.*

The claims of this (Wells) patent here in issue do not (as defendants assert) "read in terms or spirit upon Morgan patent No. 1,723,704" and the mode of operation of the elements recited in the three claims of the Wells patent in suit and the results produced thereby are not the mode of operation and the results produced by the elements of the Morgan patent.

(30) None of the prior art advanced by defendants against Bradbury patent in suit No. 2,055,246 anticipates any of the claims here in issue of that patent or renders any of them devoid of inventive character.

(31) None of the prior art advanced by defendants against Kahn and Hake patent in suit No. 2,079,618 anticipates any of the claims here in issue of that patent or renders any of them devoid of inventive character.

(32) None of the prior art advanced by defendants against Kahn and Hake patent in suit No. 2,123,699 anticipates any of the claims here in issue of that patent or renders any of them devoid of inventive character.

(33) None of the prior art advanced by defendants against Kahn patent in suit No. 1,786,429 anticipates any of the claims here in issue of that patent or renders any of them devoid of inventive character.

(34) Claims 13 and 14 of Kahn patent No. 1,717,221 are anticipated by the "Clermont" range and by the disclosure of Gummer patent No. 997,550 and each of these claims, Nos. 13 and 14, is invalid.

(35) The disclosure in Wells patent No. 1,785,568 in suit of the Wells invention as claimed fully complies with the requirements of Revised Statutes, § 4888, 35 U.S. C.A. § 33. The disclosure of this patent is not "unclear," vague or indefinite.

(36) None of the prior art advanced by defendants against Wells patent in suit No. 1,785,568 anticipates any of the claims here in issue of that patent or

renders any of them devoid of inventive character.

(37) In addition to patent infringement, plaintiff, in its complaint, charged defendants with trade-mark infringement and unfair competition in trade.

(38) At the conclusion of plaintiff(s)' prima facie case, defendants moved to dismiss the bill of complaint with respect to the charge of trade-mark infringement and unfair competition alleged therein. This motion, the Court sustained at the time.

(39) Defendants, or either of them, has not made trade-mark use of the words "balanced heat" and they, or either of them, has not used the words "balanced heat," or any other similar words, unfairly in competition with the plaintiff(s).

(40) The allegations of the complaint that defendants, or either of them, was guilty of unfair competition in trade with the plaintiff, The Estate Stove Company, in adopting the "Simplimatic" control during or following so-called negotiations with the said plaintiff, were not established by the evidence.

## Conclusions of Law.

(1) Plaintiffs, The Estate Stove Company and Noma Electric Corporation, of Maryland, are, together, owners of the entire legal and equitable title and interest to and in all of the patents in suit.

(2) Plaintiffs are properly joined and have legal and equitable right to maintain this suit.

(3) Defendants are properly joined.

(4) This Court has jurisdiction of this suit.

(5) Claims 1, 11, 14 and 24 of the Bradbury patent in suit, 2,055,246, are not anticipated by the prior art; their subject matter is of inventive and patentable character; they are not invalid; and they are good and valid in law.

(6) Claims 2, 3, 4, 5 and 6 of the Kahn and Hake patent in suit 2,079,618 are not anticipated by the prior art; their subject matter is of inventive and patentable character; they are not invalid; and they are good and valid in law.

(7) Claims 4, 5, 6 and 9 of Kahn and Hake patent in suit 2,123,699 are not anticipated by the prior art; their subject matter is of inventive and patentable character; they are not invalid; and they are good and valid in law.

(8) Claims 4, 5, 6, 8, 15 and 18 of Kahn patent in suit 1,786,429 are not anticipated by the prior art; their subject matter is of inventive and patentable character; they are not invalid; and they are good and valid in law.

(9) Claims 13 and 14 of Kahn patent in suit No. 1,717,221 are anticipated by the prior art and they are invalid in law.

(10) Claims 1, 2 and 3 of Wells patent in suit No. 1,785,568 are not anticipated by the prior art; their subject matter is of inventive and patentable character; they are not invalid; and they are good and valid in law.

(11) Defendants, or either of them, did not infringe upon any trade-mark asserted by plaintiff(s).

(12) Defendants, or either of them, did not compete unfairly with plaintiff(s), or either of them.

(13) Defendants' motion to dismiss the complaint made at the end of the offering of all proofs is not well taken and should be overruled.

(14) Defendants are not entitled to prevail on their motion except to the extent that Kahn patent in suit, No. 1,717,221 now has been held invalid.

(15) Defendants' motion to dismiss is here and now overruled and denied.

Counsel may prepare and submit a decree accordingly.